**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **E.G. SOUTHWORTH,** | ) | |
| | ) | |
| | ) | **Case No. 08-CV-3149** |
| **Appellant.** | ) | **The Honorable John W. Darrah** |
| | ) | |
| **v.** | ) | |
| | ) | **Appeal from Chapter 11** |
| **UAL CORPORATION, et al.,** | ) | **Case No. 02 B 48191** |
| | ) | **The Honorable Eugene R. Wedoff** |
| **Appellees.** | ) | |

## UNITED'S MOTION TO DISMISS APPEAL

The Appellees in this matter (collectively, "United") hereby move to dismiss this bankruptcy appeal because the notice of appeal was not timely filed, depriving this Court of jurisdiction over the case. Specifically, on April 10, 2008, Bankruptcy Judge Eugene R. Wedoff entered an order (the "Order") allowing Mr. Southworth's claim as a general, unsecured claim in the amount of $66,219.90 (attached as Exhibit A). Because the claim allowed was less than the $160,536.20 he wanted, Mr. Southworth filed a notice of appeal (the "Notice") on April 23, 2008 (attached as Exhibit B). As explained below, Mr. Southworth's Notice was untimely. Accordingly, this appeal should be dismissed for lack of jurisdiction.

### BACKGROUND

E.G. Southworth is a former United pilot who filed a claim for $160,536.20 in United's bankruptcy. The claim relates to Mr. Southworth's pension account from his employment at United, which became a central point of dispute in Mr. Southworth's Ohio divorce proceedings. United had no dog in the fight between Mr. Southworth and his now ex-wife—it merely tried to enforce the orders issued by the Ohio courts fairly and dispassionately. United had nothing to gain (or lose) either way.

Mr. Southworth, nevertheless, complained about United's application and enforcement of a Qualified Domestic Relations Order (the "QDRO") issued by the Ohio court in 2000. Specifically, Mr. Southworth was unhappy that QDRO disbursements from his Pilot Directed Account Plan ("PDAP") account zeroed out his account. Mr. Southworth claimed that had United administered the account differently, a balance would have remained—i.e. that he would have ultimately gotten more money from the account, and his ex-wife would have gotten less. An arbitral panel disagreed with Mr. Southworth and held, in a detailed and thorough opinion, that United administrated his account correctly. *See* Exhibit D.

United objected to Mr. Southworth's claim in the Bankruptcy Court because it simply acted in accordance with PDAP requirements and orders from the Ohio courts adjudicating Mr. Southworth's contentious divorce proceedings. United argued that it could not be held liable to Mr. Southworth for complying with the Ohio court's instructions as United understood them, and PDAP rules. United further demonstrated that Mr. Southworth's claim was barred by a limited settlement in which Mr. Southworth *agreed* that most of the disbursements at issue would be made (the "Limited Settlement") and *released* United for making those payments.

Judge Wedoff agreed with Mr. Southworth that the Plan Administrator made certain errors in administering his account. However, Judge Wedoff recognized that Mr. Southworth— through the Limited Settlement—had agreed that his ex-wife was entitled to certain disbursements, waived his right to contest those distributions, and agreed to hold United harmless for making them. Because Judge Wedoff recognized that Mr. Southworth could not contest the distributions United made pursuant to the Limited Settlement, he instructed United to calculate Mr. Southworth's claim by determining what would have been in his account under a specific scenario, and backing out the disbursements approved in the Limited Settlement.

2

United submitted a calculation demonstrating that the most that Mr. Southworth could be awarded under the Court's theory was an unsecured claim in the amount of $66,219.90 (the amount that remained in the account immediately after the Limited Settlement disbursements). On April 10, 2008, Judge Wedoff entered an order awarding Mr. Southworth a general, unsecured claim in the amount of $66,219.90. (Ex. A, 4/9/08 Order; Ex. C, Docket Noting Entry on 4/10/08). On April 23, 2008, Mr. Southworth filed a notice of appeal (Ex. B, 4/23/08 Notice).

## ARGUMENT

Mr. Southworth's appeal must be dismissed because his notice of appeal was not timely. Under the applicable rules, his notice of appeal was required to be filed within 10 calendar days of the Order, or by April 21, 2008 (since April 20, 2008 was a Sunday). However, Mr. Southworth did not file his Notice until April 23, 2008[1]—two days late.

The applicable rules are clear. 28 U.S.C. § 158(c)(2) provides that "[a]n appeal under subsections (a) and (b) of this section shall be taken . . . in the time provided by Rule 8002 of the Bankruptcy Rules." 28 U.S.C. § 158 (c)(2). Rule 8002, in turn, requires that "[t]he notice of appeal shall be filed with the clerk within 10 days from the date of the entry of the judgment, order, or decree appealed from." Fed. R. Bankr. P. 8002. Here, the Order was entered on April 10, 2008 (Ex. A),[2] and the Notice was due on April 21, 2008 (because April 20 was a Sunday). The Notice was not filed until April 23, 2008, two days after the deadline.[3] *See* Ex. B-C.

---

[1]    The docket indicates that Mr. Southworth's Notice was filed on April 23, 2008. *See* Ex. C (docket print-out for the Court's Order—Docket No. 17050—and Mr. Southworth's Notice of Appeal—Docket No. 17053). The file stamp on the actual document is difficult to read and may say April 22, 2008. Either way, the Notice was late.

[2]    The order was signed April 9, 2008 and docketed April 10, 2008. *See* Ex. C.

[3]    Mr. Southworth may claim that weekends do not count for purposes of the 10-day period. If so, he is wrong. Bankruptcy Rule 9006 permits exclusion of non-business days only when the applicable deadline is 8 days or less. Since Bankruptcy Rule 8002 permits 10 days to appeal, non-business days count for time purposes.

Mr. Southworth's untimely filing creates a jurisdictional bar to this Court's review of the Order. As the Seventh Circuit has held, under Bankruptcy Rule 8001, Mr. Southworth's failure to appeal timely invalidates his appeal. *See In re Bond*, 254 F.3d 669, 673 (7th Cir. 2001) (reversing district court decision on the merits because the notice of appeal from the Bankruptcy Court's order was untimely filed) ("In order to perfect the appeal (and provide the district court with jurisdiction), the party must file a notice of appeal with the clerk of the bankruptcy court within 10 days of the bankruptcy court's decision."); *In re Drevlow*, 221 B.R. 767, 768 (8th Cir. 1998) ("[Bankruptcy] Rule 8001 is exceptionally clear. While failure to take any step other than filing a timely notice of appeal does not render the appeal invalid, the timely filing of a notice of appeal is both mandatory and jurisdictional.").[4] This Court specifically held as much in an earlier appeal arising from the United bankruptcy. *See In re United Air Lines, Inc.*, 337 B.R. 904, 918 (N.D. Ill. 2006) (Darrah, J.) ("The time frames prescribed by Rule 8002(a) are conditions precedent that are mandatory and jurisdictional.").

At bottom, the rules are clear—Mr. Southworth had to file his notice of appeal within 10 days of the Order. He did not, and the consequences are equally clear—Mr. Southworth's appeal must be dismissed because his untimely notice is a jurisdictional bar to review.

---

[4] *See also Sheridan Broad. Corp. v. Sound Radio, Inc.*, 109 F.3d 873, 879 (3d Cir. 1997) ("This deadline is strictly construed. The failure to file a timely notice of appeal creates a jurisdictional defect barring appellate review."); *In re Herwit,* 970 F.2d 709, 710 (10th Cir. 1992) (dismissing appeal for lack of jurisdiction where appellant filed notice of appeal one day late; *In re Universal Minerals, Inc.*, 755 F.2d 309, 311-12 (3d Cir., 1985) (same); *In re Enron Corp.*, No. 02 Civ. 5638(BSJ), 2003 U.S. Dist. LEXIS 1442 at *10 (S.D.N.Y. Feb 3, 2003) ("The time period for filing a notice of appeal is strictly enforced and failure to timely file deprives the district court of jurisdiction to review the bankruptcy court's order."); *Pellulo v. Sunbank/Miami, NA*, No. Civ-A 97-2052, 1997 WL 260207, at *2 (E.D. Pa. May 13, 1997) ("Appellant filed his notices of appeal on February 19, 1997, one day after the deadline for both the summary judgment order and the order denying his motion for reconsideration. Therefore, his appeals were untimely filed under the ten-day deadline of Bankruptcy Rule 8002(a) as computed by Bankruptcy Rule 9006(a)."); *In re New York Int'l Hostel*, 194 B.R. 313, 316 (S.D.N.Y. 1996) ("[A] failure to timely file the notice of appeal deprives the District Court of jurisdiction to review the Bankruptcy Court's order.").

## CONCLUSION

For the reasons discussed above, United respectfully requests that the Court dismiss this appeal for lack of jurisdiction.

Dated: June 4, 2008

Respectfully submitted,

United Air Lines, Inc.

By:  /s/  Michael B. Slade
Michael B. Slade
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000 (telephone)
(312) 861-2200 (facsimile)

Attorney for United

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, and all attachments thereto, were served by overnight mail on the below recipients, this 4th day of June, 2008.

Edward Southworth

380 Fort Pickens Road

Pensacola Beach, FL  32561-2012

     /s/    Michael B. Slade

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | **Chapter 11** |
|  | ) |  |
| **UAL CORPORATION, et al.,** | ) | **Case No. 02 B 48191** |
|  | ) | **(Jointly Administered)** |
| **Reorganized Debtors.** | ) |  |
|  | ) | **Honorable Eugene R. Wedoff** |
|  | ) |  |

## ORDER GRANTING ADDITIONAL RELIEF SOUGHT IN THE REORGANIZED DEBTORS' FIFTY-SECOND OMNIBUS OBJECTION TO CLAIMS RELATING TO THE CLAIM OF EDWARD SOUTHWORTH

Upon the above-captioned reorganized debtors (collectively, the "Reorganized Debtors") Fifty-Second Omnibus Objection[1] seeking entry of an order expunging Claims; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Plan; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334; and upon consideration of the Reorganized Debtors' Fifty-Second Omnibus Objection, Edward Southworth's responses, and the Reorganized Debtors' replies; and due and proper notice of the Reorganized Debtors' Fifty-Second Omnibus Objection having been given; and it appearing that no other notice need be given; and after due deliberation and sufficient cause appearing therefore; it is HEREBY ORDERED:

1.      Claim No. 44704, filed by and on behalf of Edward Southworth is hereby reduced and allowed as a general, unsecured claim in the amount of $66,219.90.

---

[1]    All capitalized terms not defined herein shall have the meaning ascribed to them in the Fifty-Second Omnibus Objection.

2.      Poorman-Douglas, as the Reorganized Debtors' notice and claims agent, is hereby authorized and directed to update the Reorganized Debtors' Claims register to reflect the reduction and allowance of the claim as directed by this Order.

3.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

4.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

Chicago, Illinois
Dated:    April   9       , 2008

Eugene R. Wedoff
United States Bankruptcy Judge

2

# EXHIBIT B

# IN THE UNITED STATE BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

*FILED*

*UNITED STATES BANKRUPTCY COURT*
*NORTHERN DISTRICT OF ILLINOIS*

*APR ## 2008*

*KENNETH S. GARDNER, CLERK*
*PS REP. - EG*

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| UAL CORPORATION, et al.,     (UAL) | ) | Case No. 02 B 48191 |
|  | ) | Priority Claim Number 44704 |
| Appellee/Reorganized Debtors. | ) | Claim Date: 10/05/05 |
|  | ) | Claim Total: $321,302.15 [recalculated] |
|  | ) |  |
| 02-48191 – 349835 – Omn52 - 4 | ) | Honorable Eugene R. Wedoff |
| SOUTHWORTH, EDWARD G.     (EGS) | ) |  |
| 380 FORT PICKENS RD | ) | Date of Order:                 04/09/08 |
| PENSACOLA BEACH, FL 32561-2012 | ) |  |
| 850-572-0853 | ) | Date of PRAECIPE:          04/17/08 |
|  | ) |  |
| Appellant/Claimant/Participant | ) | Date of Docketing Statement:  04/17/08 |

## NOTICE OF APPEAL

Appellant, Edward G. Southworth (EGS/Claimant/ Participant), hereby timely elects, pursuant to

*SEPARATELY ENCLOSED*

28 U.S.C. 158 (c)(1)(A), to appeal this Court's ~~attached~~ ORDER to the United States Bankruptcy

Appellate Panel for the Eighth Circuit.

$255.00 Appeal and Docketing fee total is enclosed.

E. G. Southworth
Pro se

### Served 04/17/08 by regular (*certified) USPO mail to:

*Clerk of the Bankruptcy Court (Attention Judge Eugene R. Wedoff), 219 Dearborn Street, Room 710, Chicago, IL 60604

*Counsel to Reorganized Debtors, Kirkland & Ellis (Attn: James H. M. Sprayregan, P.C., Marc Kieselstein, P.C. and David Seligman and Erik Chalut), 200 East Randolph Drive, Suite 6500, Chicago, IL 60601

Counsel to the Reorganized Debtors' debtor in possession lender (CIT Group): Schulte, Roth & Zabel (Attn: Robert J. Mrofka), 919 Third Avenue, New York, NY 10022

Counsel to the Reorganized Debtors' debtor in possession lender and exit lender (Citibank and JP Morgan): Morgan, Lewis & Bockius, LLP (Attn: Richard S. Toder and Jay Teitelbaum), 101 Park Avenue, New York, NY 10178

Counsel to the Reorganized Debtors' debtor in possession lender and exit lender (Citibank and JP Morgan): Kaye Scholer, LLP (Attn: Michael B. Solow), 3 First National Plaza, Suite 4100, 70 West Madison Street, Chicago, IL 60602

Counsel to the Reorganized Debtors' debtor in possession lender and exit lender (General Electric
    Capital Corporation): Weil, Gotshal & Manges, LLP (Attn: Richard P. Krasnow and
    Scott E. Cohen), 767 Fifth Avenue, New York, NY 10153
IRS, Atlanta Service Center, Atlanta, GA 39901-0025
Julie Ann McKenzie, 206 Vista Circle, North Olmsted, OH 44070
Office of the United States Trustee (Attn: Stephen Wolfe), 227 West Monroe Street, Suite 3350,
    Chicago, IL 60606
Official Notice and Claims Agent: Poorman-Douglas Corporation (Attn: Tina Wheelon),
    10300 SW Allen Boulevard, Beaverton, OR 97005
PBGC, POB 151750, Alexandria, VA 22315-1750
Reorganized Debtors: United Air Lines, Inc., WHQLD (Attn: John Lakosil), 1200 East Algonquin Road,
    Elk Grove, IL 60007
Representative Jeff Miller (R-FL), 324 Cannon House Office Building, Washington, DC 20515
Senator Mel Martinez (R-FL), 317 Hart Senate Office Building, Washington, DC 20510
Senator Bill Nelson (D-FL), 716 Hart Senate Office Building, Washington, DC 20510
UAL PDAP Representative (Russell), 100 Half Day Road, POB 1476, Lincolnshire, IL 60069-1476
United States Attorney General (USAG), 950 Pennsylvania Avenue NW, Washington, DC 20530-0001
United States Department of Labor, Employee Benefits Security Administration (DOL),
    200 Constitution Avenue, N. E. – Suite N-5702, Washington, DC 20210

E. G. Southworth

# EXHIBIT C

DsclDue, LEAD, OutsideVendor, SealDoc, APPEAL

**U.S. Bankruptcy Court**
**Northern District of Illinois (Chicago)**
**Bankruptcy Petition #: 02-48191**

*Assigned to:* Hon. Eugene R. Wedoff                          *Date Filed:* 12/09/2002
Chapter 11
Voluntary
Asset

*Debtor*                                                represented by **Kirkland & Ellis**
**UAL Corporation**                                                    200 E Randolph Drive
P O Box 66919                                                          Chicago, IL 60601
Chicago, IL 60666                                                      312-861-2000
Tax id: 36-2675207
                                                                      **Paul Hastings Janofsky & Walker**
                                                                      **Llp**

                                                                      **Andrew A Kassof**
                                                                      Kirkland & Ellis, LLP
                                                                      200 East Randolph Drive
                                                                      Chicago,, IL 60601

                                                                      **Andrew S Marovitz**
                                                                      Mayer Brown LLP
                                                                      71 South Wacker Drive
                                                                      Chicago, IL 60606
                                                                      312 701-7116
                                                                      Email: amarovitz@mayerbrown.com

                                                                      **Brian D Sieve**
                                                                      Kirkland & Ellis LLP
                                                                      200 East Randolph Drive
                                                                      Chicago, IL 60601
                                                                      312-861-2000

                                                                      **Bruce A Radke**
                                                                      Vedder Price Kaufman &
                                                                      Kammholz PC
                                                                      222 North LaSalle Street
                                                                      Chicago, IL 60601
                                                                      312-609-7500

                                                                      **David A Agay**
                                                                      Kirkland & Ellis
                                                                      200 East Randolph
                                                                      Chicago, IL 60601
                                                                      312 861-2342
                                                                      Email: dagay@kirkland.com

                                                                      **David R Seligman**
                                                                      Kirkland & Ellis LLP
                                                                      200 East Randolph
                                                                      Chicago, IL 60601
                                                                      312 861-2000 Ext. 2463
                                                                      Fax : 312 861-2200
                                                                      Email: dseligman@kirkland.com

Case 1:08-cv-03149    Document 5-4    Filed 06/04/2008    Page 3 of 4

*Cross-Claimant*
**Jann S Morris-Law**

represented by **Robert R Benjamin**
Querrey & Harrow, Ltd.
175 West Jackson Boulevard
Suite 1600
Chicago, IL 60604
312-540-7000
Fax : 312-540-0578
Email: rbenjamin@querrey.com

*Creditor Committee*
**Official Committee of Unsecured Creditors for UAL Corporation**

represented by **Fruman Jacobson**
Sonnenschein Nath & Rosenthal
8000 Sears Tower
Chicago, IL 60606
312 876-8000
Fax : 312 876-8080
Email:
fjacobson@sonnenschein.com

**Patrick C. Maxcy**
Sonnenschein, Nath & Rosenthal
8000 Sears Tower
Chicago, IL 60606
312 876-2810
Fax : 312 876-7934
Email: pmaxcy@sonnenschein.com

*Creditor Committee*
**Sommer Barnard PC**

represented by **Michael C. Moody**
O'Rourke& Moody
161 North Clark Street
Suite 2230
Chicago, IL 60601
312 849-2020
Fax : 312 849-2021
Email:
mmoody@orourkeandmoody.com

| Filing Date | # | Docket Text |
|---|---|---|
| 04/09/2008 | 17050 | Order Granting (RE: 16864 Objection to Claim, ). Signed on 4/9/2008 (Flowers, Michael) (Entered: 04/10/2008) |
| 04/10/2008 | 17051 | Order Granting (RE: 16991 Objection to Claim, ). Signed on 4/10/2008 (Flowers, Michael) (Entered: 04/11/2008) |
| 04/23/2008 | 17053 | Notice of Appeal to District Court. Filed by E. G. Southworth . Fee Amount $255 (RE: 17050 Order RE: Claims (Outside Vendor/Omnibus Objections)). Appellant Designation due by 5/5/2008. Transmission of Record Due by 6/2/2008. (Rance, Gwendolyn) (Entered: 04/24/2008) |

| PACER Service Center |
|---|
| Transaction Receipt |

Illinois Northern Bankruptcy Live System - Docket Report

| 06/03/2008 10:01:39 | | | |
|---|---|---|---|
| **PACER Login:** | ke2435 | **Client Code:** | 31484-209 |
| **Description:** | Docket Report | **Search Criteria:** | 02-48191 Fil or Ent: filed From: 4/7/2008 To: 4/23/2008 Doc From: 0 Doc To: 99999999 Term: included Format: HTML |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

# EXHIBIT D

BEFORE THE
PENSION BOARD
OF THE
UNITED AIRLINES PILOT DIRECTED ACCOUNT PLAN

*In the Matter of the Dispute Submitted by:*

**Edward G. Southworth,**               **Decision on Review**

*Pilot Participant.*

  This matter comes before the Pension Board (the "Board") of the United Airlines Pilot Directed Account Plan (the "PDAP") on the Submission of Edward G. Southworth, a Pilot Participant in the PDAP (the "Participant"), pursuant to Section 9.1 of the PDAP. By letter dated July 1, 2003, the Participant filed with the Pension and Welfare Plans Administrative Committee ("PAWPAC" or the "Plan Administrator") of United Air Lines, Inc. (the "Company") a claim challenging the Plan Administrator's implementation of a Qualified Domestic Relations Order (the "QDRO") applicable to his Account under the PDAP and asserting in substance that the Plan Administrator miscalculated the amount payable to the Participant's former wife, Julie A. (Southworth) McKenzie (the "Alternate Payee") under the terms of the QDRO. Participant's claim further asserted in substance that the Plan Administrator had overpaid the Alternate Payee by $128,428.96 and sought to have that amount, together with gains and losses since the date of payment restored to his account. By letter dated August 13, 2003, from Craig Musa, the Company's Manager of Pension Plans, the Plan Administrator denied Participant's claim.

1

By letter dated September 2, 2003, Participant appealed the denial of his claim. Pursuant to Section 9.1 of the PDAP, this Board has the exclusive power to hear and determine all disputes arising out of application or interpretation of the PDAP or concerning benefits or participation in the PDAP and, with respect to such disputes, the Board functions as a system board of adjustment as provided in Title II of the Railway Labor Act, the decision of the Board being final and binding on all parties.

Although, in several respects, Participant's September 2, 2003 letter does not comply with the requirements of Section 9.1(c) and (d), the Board accepts the letter as the Participant's Submission under Section 9. There is no issue as to timeliness of the Submission. The Plan Administrator filed and served an answer to the Submission on October 13, 2003.

The Participant having waived hearing and oral argument in his September 2, 2003 letter and having reiterated that waiver by letter dated September 18, 2003, the Board convened to consider Participant's Submission on March 10, 2004. At that meeting, the Board determined that additional information and clarification was required and directed the Chairman to communicate with the Participant for the purpose of obtaining that information and clarification. The Chairman accordingly wrote to Participant on April 12, 2004. Participant replied by letter dated April 17, 2004. The Board reconvened to consider the Participant's Submission and the Plan Administrator's Answer on May 25, 2004.

**Factual Background**

On or about August 23, 1994, the Alternate Payee filed in the Court of Common Pleas, Cuyahoga County, Ohio, a Complaint for Divorce, Support, Alimony, Restraining Orders and Other Equitable Relief against Participant. The Complaint named as additional defendants the

Company, the Plan Administrator and the PDAP, together with a number of other parties having

no interest in the present proceeding. Immediately upon the filing of the Complaint, the Court

entered a Judgment Entry Granting Temporary Restraining Orders which, among other things,

restrained and enjoined Participant from withdrawing any funds or encumbering any interest

which he then had in any retirement or pension funds and restrained and enjoined the Plan

Administrator and the PDAP from "dispensing any funds held in certain pension funds, profit

sharing plan, savings funds and insurance policies...." Upon receipt of the Order, the Plan

Administrator froze benefits as required by the Order and in accordance with the PDAP's

standard procedures in such matters.

On October 20, 1997, the Ohio court entered a Judgment Entry granting Participant and

Alternate Payee a divorce and providing for division of their marital property. To the extent here

relevant, the court's Judgment Entry provided that Alternate Payee was to receive $203,914.00

from Participant's Account under the PDAP, the remainder of the Account balance being

awarded to Participant. The Restraining Order previously entered was dissolved.

Subsequent to the entry of the October 20, 1997 judgment, the parties submitted a draft

of a proposed domestic relations order to the Plan Administrator for review. Paragraph 7 of the

draft order provided:

> 7. Amount of Alternate Payee's Benefit: This Order assigns to Alternate Payee a portion
> of Participant's Total Account Balance under the Plan in an amount equal to Two
> Hundred Three Thousand Nine Hundred Fourteen Dollars ($203,914.00), effective as of
> August 1, 1996 (or the closest valuation date thereto), plus any interest and investment
> earnings or losses attributable thereon for periods subsequent to August 1, 1996, until the
> date of total distribution.
>
> In the event the Alternate Payee does not elect an immediate distribution, her
> share of the benefits described above shall be segregated and separately maintained in
> Account(s) established on her behalf and shall additionally be credited with any interest
> and investment income or losses attributable thereon from August 1, 1996, until the date

> of total distribution to the Alternate Payee. The Alternate Payee's portion shall be proportionately divided among the investment funds as Participant's account(s) are allocated as of the date the Order becomes qualified.

Under this paragraph of the draft order, the portion of Participant's PDAP Account awarded to the Alternate Payee was required to be credited with investment earnings and losses from August 16, 1996 to the date of distribution to the Alternate Payee.

Under Section 5.1(e) of the PDAP, where the terms of a qualified domestic relations order required the establishment of an account in an alternate payee's name, PAWPAC is required to establish and maintain a "QDRO Account in the name of the alternate payee". As a matter of administrative practice, the Plan Administrator also establishes a separate account for an alternate payee under a domestic relations order when it appears that the process of determining whether such a domestic relations order is a "qualified" domestic relations order—a "QDRO"—within the meaning of Section 414(p) of the Internal Revenue Code and Section 206(d)(3) of the Employment Retiree Income Security Act of 1974 ("ERISA") cannot be accomplished in a reasonable time, the rule in 1997-99 being four to six weeks. Prior to June 1, 1999, Section 6.7 of the PDAP provided that the assets in any QDRO Account be invested in the Money Market Fund. In addition, prior to June 1, 1999, the PDAP record keeper did not have the capacity, on an automated basis to compute separately the amount of investment earnings and losses attributable to a portion of a participant's account.

By letter dated December 17, 1997 (the "Hyszczynski Letter"), Elizabeth Hyszczynski of the Company's Law Department, communicated to the attorneys for the Participant and the Alternate Payee the Law Department's comments on the draft order. With respect to the draft order relating to the PDAP, Ms. Hyszczynski stated that the order would be approved as a

4

QDRO if the revisions indicated in the enclosed marked-up copy of the draft were made and went on to state:

> Under the PDAP and the proposed Order, the Alternate Payee is entitled to $203,914.00 from the Participant's account balance August 1, 1996. This amount shall be brought forward from August 1, 1996 to the date of distribution to the Alternate Payee at the rate of earnings from time to time in the Money Market Fund. Benefit payment will be made in lump sum.

The enclosed mark-up of the draft order struck out the reference to "investment income".

In the meantime, both Participant and the Alternate Payee appealed the Ohio court's October 20, 1997 order and the appeal process consumed virtually the entirety of 1998. In December 1998, the Ohio appellate court reversed the trial court in part and remanded the case for further proceedings. On remand, by order entered March 3, 1999, the Ohio court revised the October 20, 1997 property division by reducing the Alternate Payee's share of Participant's PDAP account from $203,914 to $169,923. On April 15, 1999, the Ohio court issued a domestic relations order based on the revised award. Although Participant wrote the Company on April 15, 1999 and again on June 14, 1999, stating that he objected to the order for various reasons, he did not appeal the order and a copy of the order was received by the Plan Administrator on May 18, 1999.

The order as entered by the Ohio court differed from the 1997 draft order by providing that the amount awarded the Alternate Payee would be credited with "Money Market interest" rather than investment earnings and losses, but only if the Alternate Payee did not elect an immediate distribution of her entitlement under the order. If the Alternate Payee did elect immediate distribution, the order still required that her share of the Participant's account be

5

credited with investment earnings and losses from August 1, 1996 to the date of distribution.[1]

Because the Plan Administrator expected to make a determination as to the qualified status of the order within the normal 4 to 6 week period following its receipt, the amount awarded the Alternate Payee from Participant's PDAP account was not segregated and no QDRO Account was established for the Alternate Payee. On June 21, 1999, Marge Metzel of the Company's Law Department wrote a letter (the "Metzel Letter") to the Participant and the Alternate Payee stating that, after review of the order dated April 15, 1999, it had been determined that the order was not a QDRO, explaining:

> Paragraph 7 of the Order states that the Alternate Payee is assigned $169,923.00 as of August 1, 1996, "plus any interest and investment earnings or losses attributable thereon for periods subsequent to August 1, 1996 until the date of total distribution." Pursuant to the terms of the Plan, actual investment earnings and losses will not be calculated for the periods subsequent to the benefit division date (August 1, 1996), but will be credited with the money market rate of interest. Please revise the order to delete the quoted language since the Plan will not calculate actual investment earnings or losses.

> In the event the Alternate Payee does not elect an immediate lump sum distribution, her share of the benefits will be segregated as of the date the Plan approves the Order as a QDRO and will continue to be invested in the money market fund from such date until the date the Alternate Payee elects otherwise.

Subsequently, during the course of the summer of 1999, the Company adopted the Thirteenth Amendment to the PDAP for the purpose of complying with guidance issued by the United States Department of Labor regarding QDRO's and rights of alternate payees. The Thirteenth Amendment added a sentence to Section 5.1(e) of the PDAP which provided in substance that an Alternate Payee on whose behalf a QDRO Account is established is to be

---

[1] As entered by the Ohio court, Paragraph 7 of the domestic relations order provided:

7. Amount of Alternate Payee's Benefit: This Order assigns to Alternate Payee a portion of Participant's Total Account Balance under the Plan in an amount equal to One Hundred Sixty Nine Thousand Nine Hundred Twenty Three Dollars ($169,923.00), effective as of August 1, 1996

treated as a Participant for all purposes with respect to assets held in that Account.  Consistent

with that provision, Section 6.7 of the PDAP was amended to provide:

> 6.7  Investment of QDRO Accounts.  Upon establishment of a QDRO Account,
> PAWPAC shall direct the Trustee to invest all assets of the QDRO Account in the Money
> Market Fund.  Thereafter, assets of the QDRO Account will be invested, in accordance
> with Section 6, as directed by the alternate payee in whose name the QDRO Account has
> been established.

Following the adoption of the Thirteenth Amendment, the PDAP record keeper developed the

capacity to determine separately on an automated basis the amount of investment earnings and

losses attributable to a portion of a participant's account.

Having been informed of these developments in connection with discussions in October

1999 regarding proposed divisions of Participant's PDAP Account, the attorneys for the

Participant and the Alternate Payee took the deposition of Patricia Chaplinski, the Company's

Manager of Pension Plans, on March 6, 2000.  At the deposition, in response to questions by the

Alternate Payee's attorney, Ms. Chaplinski identified a copy of the written PDAP procedures as

amended in late 1999 to allow the Plan Administrator to calculate actual gains and losses on

PDAP accounts.  She also identified a full accounting of Participant's PDAP account for the

period August 1, 1996 through February 23, 2000.  Ms. Chaplinski confirmed that, based on that

accounting, it was now possible to calculate the actual investment gains and losses on the

account during that time period and that it was also possible to calculate the increase in value of

the $169,923 at the rate which would have applied had that amount been invested in the Money

Market Fund from August 1, 1996 through February 23, 2000.  Counsel for the Alternate Payee

requested on the record that Ms. Chaplinski provide those computations to him.  This was done

by letter from the Company to the attorney for the Alternate Payee dated March 14, 2000.

On March 28, 2000, the Company wrote to the Alternate Payee and the Participant stating that the Law Department had reviewed the order signed by the Ohio court on April 15, 1999, and had determined that the order as entered was a QDRO. The letter went on to state:

> Under the QDRO and pursuant to the terms of the PDAP, the Alternate Payee is awarded $169,923.00, plus any interest and investment earnings or losses attributable thereon for the period from August 1, 1996 and the date of segregation/distribution of the Alternate Payee's share into her account (*the date of this determination letter*).
>
> In accordance with the PDAP, interest will accrue at the money market rate from the date of segregation/distribution until such time as the Alternate Payee requests a distribution or elects to change her investment options. Under separate cover, the Alternate Payee will receive an informational package from Frank Russell Trust Company regarding the investment options available under the Pilots' Directed Account Plan.

(Italics in original.)

On March 30, 2000, before the Plan Administrator could take any action to implement the determination of March 28, 2000, Participant filed in the Ohio court a Motion for Relief from Judgment with respect to the April 15, 1999 order. As the basis for relief, Participant asserted:

> [O]n April 15, 1999 a Qualified Domestic Relations order was issued which provided, "This order assigns to alternate payee a portion of participant's total account balance under the plan in an amount equal to One Hundred Sixty-Nine Thousand, Nine Hundred and Twenty-three Dollars ($169,923.00) effective as of August 1, 1996 (or the closest valuation date thereto), plus any interest in investments, earnings or losses attributable thereon for the period subsequent to August 1, 1996 until the date of total distribution."
>
> [Participant] did not oppose the Qualified Domestic Relations Order because the [Participant] was advised that the Qualified Domestic Relations Order did not meet the requirements of the plan administrator who would only allow money market interest, and the wording of the Qualified Domestic Relations Order was not consistent with earnings or losses of funds placed in money market accounts. On March 6, 2000, [Participant] was advised that the plan administrator had reversed their previous ruling and now would honor the Qualified Domestic Relations Order and interpret it differently than the administrator had previously indicated to the [Participant]. Such a reversal by the plan administrator constitutes both mistake and surprise in the interpretation of the previous order; constitutes newly discovered evidence as to interpretation of the plan by the administrator; and justifies granting relief to the [Participant] because the order is now being interpreted in a manner contrary to the final judgment of divorce.

Simultaneously with the filing of the Motion for Relief from Judgment, Participant also filed in the Ohio court a Motion for Temporary Restraining Order. Noting the pendency of Participant's Motion for Relief from Judgment, the Motion for Temporary Restraining Order asked the Ohio court to issue "a temporary restraining order against UAL, Inc. from establishing funds in a separate account in the name of the [Alternate Payee] or, in the alternative from [*sic*] the [Alternate Payee] from altering the current placement of assets or otherwise disposing or encumbering said assets until further order of this Court." Both the Motion for Relief from Judgment and the Motion for Temporary Restraining Order were served on the Company by certified mail.

On April 13, 2000, the Ohio court entered a one-sentence judgment entry granting Participant's motion for temporary restraining order. In view of the Temporary Restraining Order, the Plan Administrator did not establish a QDRO account for the Alternate Payee and did not segregate the amount awarded to her by the Ohio court from the rest of Participant's PDAP Account in the manner stated in the Company's March 28, 2000 letter.

The issues raised by Participant's Motion for Relief from Judgment, together with issues relating to Alternate Payee's motion and Participant's cross-motion for modification of the spousal support award in the divorce proceeding, were referred by the Ohio court to a magistrate for initial determination. On July 31, 2001, the Magistrate issued a decision which granted Alternate Payee's motion to modify, denied Participant's cross-motion to modify, and also denied Participant's Motion for Relief from Judgment. Both parties filed objections to the Magistrate's decision and, on December 19, 2001, the trial court overruled the objections, adopted the Magistrate's decision and vacated the Temporary Restraining Order.

9

Participant appealed the December 19 decision and, simultaneously with the filing of the appeal, filed a motion for a stay with the appellate court seeking, in effect to reinstate the temporary restraining order. The motion was denied by the appellate court, in effect leaving the parties free to implement the April 15, 1999 QDRO.

Accordingly, the Plan Administrator notified the PDAP record keeper to establish a QDRO Account in the name of the Alternate Payee and to segregate the funds due to the Alternate Payee under the QDRO as approved March 28, 2000. Alternate Payee's QDRO Account was credited with the $169,923.00 awarded by the Ohio court as of August 1, 1966, plus a pro rata share of the actual gains and losses on Participant's account for the period August 1, 1966 through March 28, 2000. In addition, for the period from March 28, 2000 through March 18, 2002, the date distribution was made to the Alternate Payee pursuant to the QDRO distribution form submitted to her, the QDRO Account was credited with a money market rate of return. On March 13, 2002, the Plan Administrator made a partial distribution of $133,810.29 to the Alternate Payee and, on March 26, 2002, an additional partial distribution of $98,648.00, for a total of $232,458.29. These amounts were made available by liquidating the entirety of the core fund investments in Participant's PDAP account. These distributions left a balance due to Alternate Payee as calculated by the PDAP record keeper which could not be paid because the balance of Participant's PDAP account was invested in a Schwab Individual Brokerage Account (the "IBA") and Participant refused to move the necessary funds from his IBA back to his core accounts.

On May 2, 2002, the parties resolved the resulting impasse by a limited settlement agreement pursuant to which it was agreed that the Plan Administrator could make a "Partial

10

Distribution" to the Alternate Payee notwithstanding the pendency of the appeal in the Ohio appellate court. It was agreed that the Alternate Payee could withdraw a total of $266,283.74 from the PDAP, consisting of the $169,923 originally awarded her by the Ohio trial court plus 10% simple interest from August 1, 1996 to April 1, 2002.[2] The agreement provided:

> ...The Parties [*i.e.* Participant and Alternate Payee] agree that [Alternate Payee] is entitled to this Partial Distribution and that the Parties (either separately or jointly) will not contest the amount of the Partial Distribution now or in the future. By entering into this limited settlement the Parties do not prejudice their rights in the [pending appeal]. The Parties further agree that they will hold the PDAP, the Plan Administrator of the PDAP, and the Trustee of the PDAP harmless for approving the Partial Distribution now or in the future. The Parties hereby waive the right to bring any legal action in state or federal court against the PDAP, the Plan Administrator of the PDAP or the Trustee of the PDAP with respect to the Partial Distribution.

The partial settlement further provided that "[n]othing [t]herein contained...shall affect the rights of [Alternate Payee] to enforce payment of any balance due her under the Qualified Domestic Relations Order, or [Participant's] right to appeal same."

Pursuant to this limited settlement agreement, on July 5, 2002, the Alternate Payee received an additional distribution of $33,825.45 (the difference between the $232,458.29 paid to her in March and the $266,283.74 which was her agreed entitlement under the limited settlement agreement).

On January 2, 2003, the Ohio Court of Appeals affirmed the trial court's denial of Participant's Motion for Relief from Judgment. In so doing, the Court of Appeals stated:

> ...On April 15, 1999, the judge issued a QDRO for the [PDAP] retirement

---

[2] The May 2, 2002, limited settlement quantifies the interest component at $93,320.74. That figure appears to be mistaken and, when added to the $169,923 award, falls short of the total amount stated in the May 2, 2002 letter agreement, $266,283.74 (*i.e.*, $169,923 *plus* $93,320.74 *equals* $263,243.74, not $266,283.74). The $266,283.74 total appears to be approximately correct and it is that total which was paid to the Alternate Payee pursuant to the limited settlement agreement. Both the Participant and Alternate Payee, as well as their respective lawyers signed off on that amount. In any event, if the Plan Administrator was correct in ultimately paying the entire balance of the account to the Alternate Payee, any minor discrepancy in the 10% simple interest calculation had no effect on Participant.

account that awarded [Alternate Payee] $169,923 "plus any interest and investment earnings or losses attributable thereon for periods subsequent to August 1, 1996, until the date of total distribution." Neither party appealed this order, but [Participant] filed a motion for relief from judgment on March 30, 2000, claiming that he believed the account administrator would allow [Alternate Payee] to obtain interest only on her share of the account at money market rates, and that the administrator had only recently reversed its position and agreed to apportion the account's actual earnings to [Alternate Payee's] share....

...To obtain relief from judgment under [Ohio] Civ.R. 60(B), a party must demonstrate: (1) the existence of a meritorious defense, (2) entitlement to relief under one of the grounds stated in Civ.R. 60(B)(1) through (5), and (3) that the motion for relief was filed within a reasonable time.

The magistrate found that [Participant's] motion was untimely because it was an improper attempt to raise an issue that should have been raised on appeal. Although [Participant] claimed that he did not appeal because he believed the plan administrator would interpret the QDRO to allow interest at a lower rate, the magistrate found that the administrator did not notify [Participant] of its initial position until June 21, 1999, at which point the deadline for appealing the April 15, 1999 QDRO had already expired. Based on this evidence, the magistrate could reasonably conclude that [Participant] failed to appeal regardless of the administrator's position on awarding interest and that his motion failed to satisfy any of the grounds stated in Civ.R. 60(B).

(Slip Op., pp.3-5.) (Footnotes omitted.)

The Court of Appeals also rejected Participant's alternative contention, that the QDRO was void for lack of subject matter jurisdiction because it provided for a rate of return on the amount awarded Alternate Payee in excess of the 10% Ohio statutory rate of interest on judgments. The Court of Appeals held that the 10% statutory rate does not apply to cases where a written contract provides a different rate of interest and that the PDAP was such a contract. (Slip Op., pp. 5-7.)

By letter dated January 3, 2003, counsel for the Alternate Payee forwarded the Court of Appeals decision to the Plan Administrator and requested that final distribution be made. On March 27, 2003, a final distribution of $59,999.32 was made to the Alternate Payee, representing the entire remaining balance of Participant's PDAP Account. Payment was based on the PDAP

record keeper's computation of Alternate Payee's entitlement as follows:

| | |
|---|---|
| Principal per 4/15/99 QDRO: | $ 169,923.00 |
| Plus Actual Gains/Losses 8/1/96-3/27/00: | 128,529.76 |
| Adjusted QDRO Principal @ 3/27/00: | $ 298,452.76 |
| Plus Earnings @ Money Market Rate 3/27/00-3/27/03: | 30,788.11 |
| Total QDRO Distribution: | $ 329,240.87 |

The March 27, 2003 payment of $59,999.32, together with the 2002 payments aggregating $266,283.74, brought to $326,283.06 the total of the payments made to the Alternate Payee. Under the PDAP record keeper's calculation, this left a balance of $2,957.81 still owing from Participant to the Alternate Payee after all funds in Participant's PDAP Account were exhausted.

Based on the foregoing facts, Participant filed his claim dated July 1, 2003 and, following the denial of the claim by the Plan Administrator on August 13, 2003, submitted the dispute to the Pension Board by letter dated September 2, 2003. Participant supplemented his submission on September 27, 2003.

**Participant's Position**

Section 9.1(c) of the PDAP requires that "[t]he submission in each dispute will include the question to be decided by the Pension Board, the provisions of the Plan involved in the dispute, the position of the petitioner and all asserted facts supporting such position." The style and content of Participant's various communications with this Board and with the Plan Administrator do not readily lend themselves to identification of Participant's contentions or to the factual or legal bases of those contentions. Participant's preference that the matter be decided without hearing has precluded the Board from obtaining any clarification of Participant's position during an oral presentation. Accordingly, on April 12, 2004, the Chairman, at the direction of the Board, wrote to Participant setting forth the Board's

13

understanding of Participant's position, the arguments being advanced by him in support of that position and the documents Participant wished the Board to take into consideration in ruling on his claim, and inviting Participant to indicate any inaccuracy in the Board's understanding or any omission in the arguments or documentation on which Participant relies. Participant's April 19, 2004, response was not helpful.[3]

Based on the Participant's various communications, including his claim of July 1, 2003, his appeal of September 2, 2003, and his supplemental submission of September 27, 2003, this Board understands that Participant is asking that $128,428.96 be restored to his PDAP account as of March 31, 2003, and that the restored balance be credited with gains and losses thereafter, based on Participant's investment directions then in effect. The Board further understands that

---

[3] In response to the Chairman's statement of the Board's understanding of Participant's claim and the arguments relied upon in support of that claim, Participant replied:

> The "full and accurate statement of [my] position" is not yours to make, not defined by your assumptions of accuracy and completeness and not changed from that clearly stated in my 07/01/03 claim… Without comment on their correctness, your (not my) "interrelated points" have more to do with identifying specific torts and responsible individuals than with processing my claim. If asked, I will testify to what I know of the former, but my attention remains timely [sic] focused on the latter.

With respect to the Chairman's effort to identify the documentation which Participant wished the Board to consider, Participant responded:

> The written basis for my claim and its consideration by the board should include the LAW, ERISA and any statements or transactions which define the actual administration of my PDAP account. In addition to these, your omission of reference (e) [letter from Participant to the Association, the Company and others dated September 27, 2003] avoids my specific identification of problems related to the QDRO qualification reversal, the "earnings" breach of contract and the failure to segregate. Omission of references (d) through (f) [letter dated September 16, 2003, from the Company, addressee not specified; Participant's September 25, 2003, letter to the Company; and letter dated October 2, 2003, from the Company, addressee not specified] leaves identification of the applicable iteration of the amended PDAP open for debate. What the Board should consider is not my call, and there should be no limit placed on what documentation you chose to do your job.

In ruling on Participant's appeal, the Board has considered the documentation referred to in the Chairman's April 12, 2004 letter, supplemented by the additional documents, to the extent they could be identified, referenced by Participant in his April 19, 2004 response, and certain documents of record in the office of the Clerk of the Court of Common Pleas, Division of Domestic Relations, Cuyahoga County, Ohio.

14

Participant bases this claim on the following contentions:

1. The Plan Administrator failed to segregate (or establish separate accounting for) the Alternate Payee's portion of Participant's Plan account balance in a proper and timely manner. Participant's position is that segregation (or separate accounting) should have occurred as of the date of receipt of the April 15, 1999 court order, the order which was ultimately found to be a QDRO, or, at the latest, as of June 21, 1999, the date the order was initially determined not to be qualified.

2. Participant takes the further position that the failure of the Plan Administrator to segregate the Alternate Payee's portion of his PDAP Account after the March 28, 2000 determination of the qualified status of the Ohio court's April 15, 1999 order was not justified by the temporary restraining order which Participant obtained from the Ohio court. It is Participant's contention that the temporary restraining order left the Plan Administrator free to segregate the Alternate Payee's portion of the account so long as she was not allowed to withdraw any part of the segregated amount or alter the investment directions with respect to that amount.

3. Participant's further position is that appreciation of the amount assigned to the Alternate Payee by the April 15, 1999 court order ($169,923.00) from August 1, 1996 to the date of segregation of the Alternate Payee's account (June 21, 1999 at the latest), should have been calculated as of the date of segregation. Participant asserts that the appreciation for this period should have been computed at money market rates or the 10% statutory rate of interest on judgments under Ohio law.

4. Subsequent to the date segregation (or establishment of separate accounting) should

15

have been done, Participant's position is that appreciation of the Alternate Payee's portion of the account should have been calculated at either money market rates or the statutory 10% rate, but not on the basis of actual gains and losses.

5.   Participant's further position is that the Plan Administrator is guilty of breach of contract by computing appreciation on the basis of actual gains and losses up to March 28, 2000, after its representatives previously stated to Participant, orally and in writing, that appreciation would be computed at money market rates.

6.   Alternatively, Participant believes it was improper for the Plan Administrator to change the basis for computing appreciation as of March 28, 2000.   Having computed appreciation on the basis of actual gains and losses up to that date (albeit improperly in Participant's view), Participant believes the Plan Administrator should have continued to compute appreciation on that same basis until distribution to the Alternate Payee.

7.   Participant's position is that the procedures actually followed by the Plan Administrator with respect to segregation/separate accounting and the rate of computation of appreciation of the Alternate Payee's portion of the account violate some or all of the following: Section 206(d)(3)(H) of the Employee Retirement Income Security Act of 1974; Sections 404(a) and/or 414(p)(7) of the Internal Revenue Code; the April 15, 1999 court order; the January 2, 2003, Journal Entry and Opinion of the Ohio Court of Appeals; and/or the Plan's own QDRO procedures.

8.   Participant's further position is that the determination of the status of the April 15, 1999 court order was not resolved within 18 months after receipt and that Section 206(d)(3)(H) of ERISA, therefore, required that the order be given prospective effect only.

16

9.    Participant's further position is that the procedures followed by the Plan Administrator in accounting for, and computing appreciation with respect to, the Alternate Payee's portion of the account constitutes a breach of the Plan Administrator's fiduciary duty to Participant.

10.   Finally, it is Participant's position that the failure to segregate the Alternate Payee's portion of the account as of March 28, 2000, and thereafter calculating appreciation of that portion at money market rates, while leaving Participant's portion of the account subject to the vicissitudes of the market constitutes theft or embezzlement from an employee benefit plan in violation of 18 U.S.C. §1664.

**Findings and Opinion**

It is noteworthy that Participant does not now challenge either the Plan Administrator's initial determination that the order entered by the Ohio court on April 15, 1999, was not a qualified domestic relations order or its subsequent determination that the order is qualified, after all.   Rather, Participant's complaint is concerned with the manner in which the Plan Administrator implemented the order.   Central to Participant's claim is that the Plan Administrator should promptly have segregated the portion of his PDAP account assigned by the QDRO to the Alternate Payee .  In Participant's view, this failure, coupled with the manner in which the Plan Administrator computed the increase in value of the Alternate Payee's share of the account, had the effect of allowing Alternate Payee to share in the gains enjoyed by the investments of his PDAP Account during the the period, up to early 2000, when the market was steadily rising, while insulating Alternate Payee's share from the dramatic losses incurred thereafter.

Participant asserts that the methodology followed by the Plan Administrator has resulted in an overpayment to the Alternate Payee and an overcharge to him in the amount of $128,428.96 (plus gains and losses from March 31, 2003), based on a computation enclosed with his July 1, 2003 claim. He seeks to have that amount restored to his Account.

The Board notes at the outset that the maximum principal amount which Participant can claim is $59,999.32. Under the limited settlement agreement of May 2, 2002, Participant agreed that the Alternate Payee was entitled under the Ohio court's order to receive a minimum of $169,923.00, plus simple interest at the rate of 10% per annum from August 1, 1996 to April 1, 2002. That amount, $266,283.74, was paid to Alternate Payee in 2002, on the basis of the limited settlement. Participant has agreed that he will not contest the payment of that amount. Thus, the maximum amount of his claim before this Board is the difference between the agreed $266,283.74 and the total amount paid by the Plan Administrator to the Alternate Payee, $326,283.06. That difference is the $59,999.32 paid to the Alternate Payee at the end of March 2003.[4]

A second point which may be dealt with at the outset is Participant's contention that the Plan Administrator should have computed Alternate Payee's distribution by applying to the $169,923 award the 10% statutory rate of interest applicable to judgments of Ohio courts. The Board need not decide in this case whether a domestic relations order adopting the applicable

---

[4] There is a suggestion in Participant's July 1, 2003 claim that the May 2, 2002 limited settlement "proposal" was not made in good faith by the Company. There is no evidence whatever supporting that suggestion. The limited settlement, which Participant and his counsel accepted, did nothing more than permit payment to Alternate Payee of the amount which Participant was then actively arguing to the court in Ohio was what Alternate Payee was entitled to receive, leaving the parties free to litigate about whether she was entitled to more. The limited settlement was an agreement between the Participant and the Alternate Payee. Although the Company mediated it, the Company was not actually a party to the settlement and gained nothing from it except a temporary respite from the cross-fire in which it found itself as a result of the competing and irreconcilable claims of Participant and the Alternate Payee and indemnification against claims based on the Plan Administrator's actions implementing the parties' agreement.

18

state statutory rate of interest would be binding on the PDAP. Suffice it to say that the order here in question did not adopt that rate. Participant fully litigated this contention in the courts in Ohio and the Ohio Court of Appeals expressly held in its January 3, 2003 decision that the 10% statutory rate does not apply to the QDRO which is the subject of this claim. Accordingly, since neither the QDRO nor the terms of the PDAP provide for application of the Ohio judgment rate of interest, the question of accumulation at the 10% rate is not an issue here.

The first of Participant's specific contentions is that the Plan Administrator should have segregated (or established separate accounting for) Alternate Payee's portion of the PDAP Account as of the date the Plan Administrator received the April 15, 1999 order (May 18, 1999), or, at the latest, as of June 21, 1999, the date the Plan Administrator determined the order was not qualified. In the Board's view, this contention fails. Under PDAP procedures in effect in May 1999, the Plan Administrator did not segregate the amounts awarded to any alternate payee under a domestic relations order as long as it appeared that the decision whether that order was "qualified" or not could be made in a reasonable time, using four to six weeks from receipt as the measure of "a reasonable time". Here, the domestic relations order was received on May 18, 1999, and was determined not to be qualified on June 21, 1999, a period of 34 days or less than 5 weeks. The Board finds that the determination as to the qualified status of the order in question was made within a reasonable time in compliance with PDAP procedures and that segregation was not required between May 18, 1999 and June 21, 1999.

Moreover, the Board notes that, even if the Plan Administrator had segregated the Alternate Payee's share of Participant's PDAP Account as of May 18, 1999, any segregated amount would have been restored to Participant's Account as of June 21, 1999. Under PDAP

19

procedures and under Section 206(d)(3)(H)(iii) of ERISA, once the Plan Administrator makes a determination that a domestic relations order is not qualified, the Administrator is required to pay the segregated amount to the person or persons who would have been entitled to such amounts if there had been no such order. That would have meant in this case that any segregated amounts (and any accumulation of interest or earnings during the 34-day period) would have been required to be restored to the Participant's Account as of the date the order was found not to be qualified. Thus, the financial effect from the Participant's point of view would be precisely the same as if no segregation had taken place. Thus, there is no showing that Participant suffered any injury by virtue of any failure to segregate from May 18, 1999 to June 21, 1999.

Participant's fallback position, that, even if the Plan Administrator was not required to segregate the Alternate Payee's portion of his Account as of May 18, 1999, it should have segregated her portion from June 21, 1999 on, is simply in error. Under PDAP procedures and under Section 206(d)(3)(H)(iii) of ERISA, even in a case where segregation is initially required, that requirement obtains only during the period when the question whether or not the domestic relations order in question is qualified is under consideration. Once it is determined that the order is not qualified there is no longer any requirement of segregation. As a matter of fact, at the point a domestic relations order is found not to be qualified, the plan is legally required to terminate any segregation. The Board therefore finds that the Plan Administrator acted properly in not segregating the Alternate Payee's putative portion of the PDAP Account subsequent to its June 21, 1999 determination that the order was not a QDRO.

On March 28, 2000, the Plan Administrator determined that the April 15, 1999 order of the Ohio court was a QDRO. At that point, as indicated in the Company's letter to the

20

Participant and the Alternate Payee of that date, the Plan Administrator would have followed the PDAP procedure of establishing a separate QDRO Account in Alternate Payee's name. Before this could be done, however, the Company was served with Participant's Motion for Temporary Restraining Order, a motion which was granted two weeks later. The Plan Administrator honored the temporary restraining order and consequently refrained from segregating Alternate Payee's share of the PDAP funds pending litigation of Participant's efforts to secure modification of the QDRO and the ensuing appeal.

Participant contends that the temporary restraining order did not preclude segregation of Alternate Payee's share of his PDAP account. He argues that, under the terms of the order, the Plan Administrator had a choice: either not to segregate the funds, or to segregate them but not allow Alternate Payee to withdraw those funds or alter the investment directions. Participant contends that the Plan Administrator should have done the latter.[5]

A reading of Participant's Motion for Temporary Restraining Order[6] makes clear that this is not the case. Participant's Motion sought an order "against the [Alternate Payee] or, in the alternative UAL, Inc. (United Airlines) who is a party of limited scope to these proceedings. The prayer for relief in the Motion stated:

> Wherefore, [Participant] moves this Court for issuance of a temporary restraining order against UAL, Inc. from establishing funds in a separate account in the name of the [Alternate Payee] or, in the alternative from [sic] prohibiting the [Alternate Payee] from altering the current placement of assets or otherwise disposing or encumbering said assets until further order of this Court.

---

[5] The Board does not understand Participant to be arguing that the Plan Administrator should simply have ignored the Temporary Restraining Order and proceeded to segregate Alternate Payee's PDAP share contrary to the terms of that Order. This would be illogical since he is the one who obtained the order and framed its terms in the first place.

[6] The order itself is a single sentence granting the motion. Therefore, it is necessary to refer to the motion to determine what action the PDAP is restrained from taking.

Thus, it is perfectly clear that the only relief sought against the Company, and, therefore, the only relief granted by the Ohio court against the Company, was a restraining order against establishing a separate account for Alternate Payee. The "alternative" relief sought by Participant is relief against the Alternate Payee, not the Company. The Plan Administrator could not have established a QDRO Account for Alternate Payee or otherwise segregated her funds without violating the temporary restraining order. Participant's contention that the Plan Administrator was free either to leave the Participant's funds unsegregated, or to segregate her funds but deny her access or power of direction over the segregated funds, is contrary to the plain language of the order.[7]

For these reasons, the Board finds that the Plan Administrator did not act improperly by failing to establish a separate QDRO Account for Alternate Payee or otherwise segregate her share of the PDAP funds at any point prior to the final distribution to her. Accordingly, the Board rejects Participant's arguments based on the failure to segregate.

Participant's second line of reasoning challenges the manner in which the Plan Administrator computed the appreciation of Alternate Payee's $169,923 award. As noted above, the Plan Administrator allocated to the Alternate Payee her proportionate share of actual investment gains and losses from August 1, 1996, the date established by the Ohio court, through March 28, 2000, the date the April 15, 1999 court order was determined to be a QDRO. For the period from March 29, 2000 through the date final distribution was made to Alternate Payee on March 27, 2003, the Plan Administrator credited the portion of Alternate Payee's share

---

[7] Even if Participant's reading of the temporary restraining order were correct—which it clearly is not—the Participant would have no basis for complaint because the Plan Administrator made a choice between two alternative modes of compliance offered by the order drafted by Participant's counsel.

22

remaining undistributed from time to time with the rate of return it would have realized had it been invested in the PDAP Money Market Fund.

In challenging this methodology, Participant first contends that, for the period from August 1, 1996 to the date of segregation of her share of the PDAP Account (an event which Participant would say should have occurred by June 21, 1999), Alternate Payee should only have been credited with a money market rate of return, not with actual investment gains and losses.[8] That, however, is not what the QDRO says.

On the contrary, the QDRO expressly states that Alternate Payee's share is to be credited with "any interest and investment earnings or losses attributable thereon for periods subsequent to August 1, 1996, until the date of total distribution." It was precisely because the terms of the PDAP, in June 1999, did not allow allocation of actual investment earnings and losses to an alternate payee's share of a PDAP account, and because the Plan Administrator was not administratively equipped to do the necessary computation to accomplish such an allocation, that the April 15, 1999 court order was originally determined not to be qualified. And it was precisely this language in the QDRO which Participant sought to have modified by the Ohio court through the Motion for Relief from Judgment which he filed immediately on learning that implementation of the order had become permissible as a result of the amendment to the PDAP and the development of enhanced administrative capability. Indeed, almost everything that happened in the conflict between Participant and Alternate Payee would be completely

---

[8] On March 14, 2000, pursuant to the request of Alternate Payee's counsel at the Chaplinski deposition, the Company furnished the parties a calculation of the earnings on Alternate Payee's share of the PDAP account from August 1, 1996 through February 23, 2000. According to the Company's computation, the Alternate Payee's aliquot share of the actual investment earnings on the account for that period was $105,352.00. On a money market basis during that same period, the earnings would have been $30,872.00.

nonsensical unless it is recognized that everyone clearly understood that the order required Alternate Payee to be credited with actual gains and losses.

It is true that Paragraph 7 of the QDRO contains an alternative method of appreciating Alternate Payee's PDAP share after August 1, 1996, providing for a money market rate of return. That method is applicable, however, only "[i]n the event the Alternate Payee does not elect an immediate distribution." That provision never became operative because Alternate Payee was at all times attempting to secure an immediate distribution of her share of the PDAP funds. She was thwarted in those attempts by events in the divorce litigation, but the delay in distribution was not because she "d[id] not elect an immediate distribution."

The Board is therefore persuaded that the Plan Administrator's valuation of Alternate Payee' PDAP share on the basis of actual investment gains and losses from August 1, 1996 through March 28, 2000, the date as of which the April 15, 1999 court order was determined to be a QDRO, was proper. That method of valuation is fully consistent with the QDRO and the procedures under the amended PDAP.

In his July 1, 2003 claim, Participant states that the Company "broke [its] word" to him by using investment earnings instead of money market rates for valuing Alternate Payee's PDAP share as of March 28, 2000. In his appeal, he states that the Company "broke [its] written contract" with him regarding the rate of appreciation that would be used. He contends that, had he known actual investment gains and losses would be used rather than a money market rate, he would have appealed the April 15, 1999 order.[9]

---

[9] Participant characterizes the legal theory as breach of contract. There is no contract issue here. There is no offer and acceptance or exchange of consideration involved. The essence of Participant's contention is that he was told that a money market rate of interest would be used, that he relied on that representation and that, because of that representation, he did not take an appeal which he would otherwise have taken in the divorce litigation. That contention,

This Board is mindful that its jurisdiction is limited to disputes arising out of application or interpretation of the PDAP or concerning benefits under, or participation in, the PDAP. The question before the Board in this case is whether the manner in which the Plan Administrator computed the appreciation of Alternate Payee's PDAP share for the period subsequent to August 1, 1996, is, or is not, consistent with Participant's rights under the PDAP, the PDAP procedures and the QDRO. Whether Participant has other, different rights, deriving from sources other than the PDAP, the PDAP procedures and the QDRO, is not a question within the purview of this Board.

Participant places primary reliance on the Hyszczynski and Metzel Letters as the sources of the ostensible promise to use money market rates rather than actual investment earnings. The Board has reviewed those letters, not as an independent basis of rights for Participant, but for the purpose of determining whether the Plan Administrator has consistently adhered to the provisions of the PDAP and followed PDAP procedures. The Board finds that those letters are accurate and correct statements of what the PDAP provided and the PDAP procedures permitted as of the times they were written, December of 1997 and June of 1999, respectively. At the time both those letters were written, the PDAP and its procedures did not allow for allocation of actual investment earnings and losses to an alternate payee's share of a PDAP account. Those letters did not undertake or promise that the PDAP and its procedures would remain forever unchanged or that any future changes would not apply to Participant and the Plan Administrator would have had no authority to make any such undertaking or promise.

The Board accordingly concludes that the Plan Administrator properly used actual

however, was fully litigated by Participant in the Ohio courts in the context of his Motion for Relief from Judgment. The contention was rejected by the Magistrate, the trial judge and the Court of Appeals.

investment earnings and losses for purposes of determining the appreciation of Alternate Payee's PDAP interest for the period August 1, 1996 through March 28, 2000.

Participant argues in the alternative that, if actual investment result is to be the basis of valuing Alternate Payee's PDAP share up to March 28, 2000, it was improper for the Plan Administrator to change to the money market rate for valuing her share after that date. Participant does not articulate the basis for this argument but, presumably, he relies on the "either/or" character of the QDRO. Under the language of Paragraph 7 of the QDRO, if the Alternate Payee elects immediate distribution, her share of the PDAP is to be valued on the basis of actual investment gains and losses from August 1, 1996, "until the date of total distribution". On the other hand, if the Alternate Payee does *not* elect immediate distribution, her share is to be valued on the basis of a Money Market rate of interest from August 1, 1996, "until the date of total distribution." Nothing in the language of the QDRO authorizes the use of actual investment return for one portion of the period from August 1, 1996 until total distribution, and use of money market rates for the remainder of that period. Presumably, therefore, the Participant would argue that, since the Plan Administrator had decided to treat Alternate Payee as having elected immediate distribution, the QDRO required that her PDAP share be determined on a single consistent valuation basis, namely, actual investment earnings and losses, for the entire period from August 1, 1996 to the "date of total distribution." This argument assumes, of course, that March 27, 2003, the date the last payment was actually made to the Alternate Payee, is the "date of total distribution" referred to in the QDRO.

The Company's letter of March 28, 2000 to the Participant and Alternate Payee made clear, however, that the Plan Administrator was treating the date of that letter as the "date of

26

segregation/distribution of the Alternate Payee's share into her account." Moreover, the Company's letter expressly stated that, "[i]n accordance with the PDAP, interest will accrue at the money market rate from the date of segregation/distribution until such time as the Alternate Payee requests a distribution or elects to change her investment options."[10]

It is very clear that, under the amended terms of the PDAP and the PDAP procedures in effect in March 2000, the Plan Administrator was required, immediately upon determining that the April 15, 1999 order was a QDRO, to establish a separate QDRO Account for Alternate Payee and thereafter treat her as a participant with respect to that Account. The PDAP further required that Alternate Payee's QDRO be initially invested in the PDAP Money Market Fund, and remain there until it was either withdrawn by the Alternate Payee or the Alternate Payee gave different investment directions. The Company's March 28, 2000 letter to the Participant and Alternate Payee makes clear the Plan Administrator was prepared to do just that and was then in the process of doing so. The only reason the Plan Administrator did not then establish a separate QDRO Account for Alternate Payee was that Participant obtained a temporary

---

[10] It is clear that Participant fully understood that appreciation of the Alternate Payee's PDAP interest subsequent to March 28, 2000 would be computed by the Plan Administrator on the basis of money market rates of interest. In a letter to the Company dated June 20, 2001, referring to the March 28, 2000 letter, Participant expressly noted that the PDAP had lost over 20% of its value since the parties last appeared in the divorce court and that Alternate Payee's interest "appreciates at whatever rate is finally litigated, without market risk." And, in a letter to the Company dated September 24, 2001, Participant complained of the unfairness of the March 28, 2000 letter, stating among other things that "[t]he calculation of gains and losses from 08/01/96 through 03/27/00 (a period which includes the all time peak of investment appreciation) would increase the windfall [to Alternate Payee] without risk," and that "[t]he application of '...Money Market earnings [from 03/28/00] until the date of distribution...' would preserve the windfall..." and would insulate Alternate Payee's share from risk "during a disastrously down market...." Notwithstanding the knowledge, Participant obtained the temporary restraining order preventing the very segregation of Alternate Payee's PDAP share he now argues should have been implemented. That order remained in effect until January 2003 and there is no indication that Participant ever sought to have it vacated or modified. Moreover, the temporary restraining order was in aid of the Participant's parallel motion for relief from judgment. It is noteworthy that, although the motion for relief from judgment sought to modify the QDRO to preclude the use of actual investment earnings as the basis for valuation of Alternate Payee's share, the method being used by the Plan Administrator for the period from August 1, 1996 through March 27, 2000, the motion did not in address the Plan Administrator's expressed intention to use money market rates after March 28, 2000.

restraining order prohibiting the Company from doing so.

The temporary restraining order—whether considered in its own right or considered as a stay of effectiveness of the April 15, 1999 court order as the Ohio Court of Appeals seems to have regarded it—cannot be interpreted as requiring the PDAP to continue to value Alternate Payee's interest on the basis of actual investment gains and losses beyond the point at which the PDAP requires that a different valuation method apply. To interpret the TRO in that manner would require the Plan Administrator to violate the terms of the PDAP. It would, in effect, require the PDAP to provide to Alternate Payee a type or form of benefit not otherwise provided by the PDAP, something which no state court order can do under Section 206(d)(3)(D) of ERISA. While the TRO had the effect of delaying the Plan Administrator's implementation of the PDAP procedures for establishment of a QDRO Account for Alternate Payee for nearly three years after the point at which that would otherwise have been done, it could not, in the judgment of this Board, have the effect of overriding the requirement of the PDAP that, from and after March 28, 2000, until the Alternate Payee withdrew her share or directed that it be differently invested, that share be valued on the basis of a money market rate of return.

Accordingly, the Board finds that the Plan Administrator properly treated March 28, 2000 as the "date of total distribution" under the QDRO and properly applied a money market rate of return for purposes of valuing Alternate Payee's interest from and after March 28, 2000, the date it determined the April 15, 1999 order to be a QDRO. In reaching its conclusion, the Board believes that market movements after March 28, 2000 are, quite literally, irrelevant. The market might have moved up or down after that date. That would not change the fact that the PDAP requires the application of a money market rate from the date of the QDRO determination

28

until distribution or reinvestment.

The remainder of Participant's contentions requires little discussion. From what has been said above, it is clear that the Board believes that the actions of the Plan Administrator are in accordance with the PDAP, the PDAP procedures, the QDRO here involved, the decision of the Ohio Court of Appeals denying Participant's motion to modify the QDRO, Section 206(d)(3)(H) of ERISA and the corresponding section of the tax code, Section 417(p)(7) of the Internal Revenue Code. Issues relating to the deductibility of employer contributions to the PDAP under Section 404 of the Code are not part of the responsibility or authority of this Board.

As for Participant's contention that the actions of the Plan Administrator somehow violate the requirement under Section 206(d)(3)(H) that, if the determination of the qualified status of a domestic relations order cannot be accomplished in 18 months, the order is effective only prospectively, that rule clearly does not apply. Both the initial determination that the April 15, 1999 order was not qualified, and the subsequent determination that the order was, in fact, a QDRO, were made within 18 months of the receipt of the order. To the extent that the argument is merely a restatement of Participant's argument that segregation of the Alternate Payee's PDAP interest was required, that contention is fully disposed of above.

While it is the judgment of this Board that it has no jurisdiction to determine claims of breach of fiduciary duty, the members of the Board are mindful that, as fiduciaries, they may have some responsibility for actions of co-fiduciaries. However, as the foregoing discussion makes clear, it is the judgment of the Board that the Plan Administrator has acted in strict accordance with the PDAP and the PDAP procedures and it necessarily follows that there cannot have been any breach of fiduciary duty by the Plan Administrator or its representatives.

29

Finally, Participant claims that the Plan Administrator and its representatives are guilty of criminal conduct under 18 U.S.C. §1664.  This Board has no jurisdiction over that claim. However, as with the allegation of breach of fiduciary duty, the Board finds that the Plan Administrator has acted in strict accordance with the PDAP and the PDAP procedures and it necessarily follows that it is unlikely there can have been any criminal conduct under 18 U.S.C. §1664.[11]

**Award:**

> The claims of Participant Edward G. Southworth are denied, and the actions of the Plan Administrator with respect to the computation and payment of Alternate Payee Julie A. (Southworth) McKenzie are ratified and approved.

> This Award is executed as of this 20th day of September, 2004.

PENSION BOARD OF THE UNITED AIRLINES
PILOT DIRECTED ACCOUNT PLAN


Capt. Marty Torres, Association Member, Chairman
Mr. Cliff Hew, Company Member
Mr. Chuck Vanderheiden, Company Member
Capt. Mike Ballard, Association Member

---

[11] At earlier stages of the proceedings, Participant made two other arguments which the Board has considered. Participant complained at various stages that his post-decree employer and employee PDAP contributions were not protected from invasion in connection with the valuation of Alternate Payee's PDAP interest. Nothing in the QDRO, the PDAP or the PDAP procedures required such protection. In fact, this argument is simply a restatement in a more limited form of Participant's complaint about the failure to segregate, which argument has been fully addressed above. The second complaint has to do with Participant's Individual Brokerage Account. Participant complains about the Plan Administrator's liquidation of assets held in that Account in order to meet the requirements of the QDRO and also complains that the Plan Administrator "ignored" his own efforts to withdraw assets in his Individual Brokerage Account. The liquidation of the Individual Brokerage Account was in accordance with PDAP procedures which were fully disclosed to PDAP participants (*see*, PDAP Update dated October 31, 2001) and it was, in the Board's judgment, entirely appropriate for the Plan Administrator to decline, in the absence of segregation of Alternate Payee's PDAP interest and pending the outcome of the divorce litigation, to honor Participant's efforts to withdraw assets from his Independent Brokerage Account.